UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
LORETTA AZUKA OBI,  :
                Plaintiff,  :
                                                                                   : **OPINION AND ORDER**
v.  :
                                                                                   : 19 CV 3022 (VB)
WESTCHESTER MEDICAL REGIONAL  :
PHYSICIAN SERVICES, P.C. and  :
MIDHUDSON REGIONAL HOSPITAL,  :
                Defendants.  :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiff Loretta Azuka Obi, proceeding pro se, brings this action against Westchester Medical Regional Physician Services, P.C. and MidHudson Regional Hospital, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law ("NYSHRL").

Now pending is defendants' motion to dismiss under Rule 12(b)(6). (Doc. #18).

For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the amended complaint and draws all reasonable inferences in plaintiff's favor.

I. Plaintiff's Employment at MidHudson Regional Hospital

Plaintiff alleges that from October 15, 2014, to August 5, 2016, Westchester Medical Regional Physician Services, P.C. employed her to work at MidHudson Regional Hospital, in

1

Poughkeepsie, New York, as a night-shift physician. Westchester County Health Care Corporation, a public benefit corporation, owns MidHudson Regional Hospital.[1]

Plaintiff alleges program director Dr. Murtaza Bhatti, manager Dr. Cordelia Sharma, and Dr. Lance Bruck were her supervisors at MidHudson Regional Hospital. Plaintiff further alleges she was the lone night-shift medical doctor during her shifts at MidHudson Regional Hospital.

II.     Alleged Discrimination

Plaintiff clams that around May 1, 2015, she was accused of providing poor quality care to a patient she evaluated and discharged from the emergency department. Plaintiff says that on May 6, 2015, when she informed program director Dr. Bhatti about the circumstances surrounding the patient's discharge, the "issue was dropped." (Doc. #16 ("Am. Compl.") at ECF 17).[2]

Plaintiff further alleges that on May 6, 2015, she told Dr. Bhatti certain essential medical machines were broken and malfunctioning, and that some equipment, which had been removed for repairs, was returned still malfunctioning. Plaintiff alleges Dr. Bhatti told plaintiff she "needed to keep a low profile and be less visible and audible because of [her] race and color," and that plaintiff was "going to be set up for unrelentless [sic] attacks." (Am. Compl. at ECF 17). Plaintiff allegedly responded by asking if Dr. Bhatti was "indicating that [plaintiff] shouldn't speak up [about] critical issues . . . affecting" her work and patient care or "express

---

[1] See Hess v. Mid Hudson Valley Staffco LLC, 2018 WL 4168976, at *1 (S.D.N.Y. Aug. 30, 2018), aff'd, 776 F. App'x 36 (2d Cir. 2019) (summary order); Harris v. Viau, 2019 WL 1331632, at *1, n.2 (S.D.N.Y. Mar. 25, 2019). Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations. Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

[2] "Am. Compl. at ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing System.

2

[her]self due to [her] race." (Am. Compl. at ECF 17, 19). Plaintiff claims that about one week later, she told Dr. Sharma about Dr. Bhatti's "illegal racial comment." (Am. Compl. at ECF 19).

Plaintiff alleges additional staff were hired around June 2015. Accordingly, plaintiff asked Dr. Bhatti to place her on a 7:00 p.m. to 7:00 a.m. schedule due to her childcare needs. Although plaintiff states Dr. Bhatti previously had promised to place plaintiff on this schedule once additional staff was hired, plaintiff claims Dr. Bhatti did not do so because of the complaint she had made to Dr. Sharma. Plaintiff alleges that in August 2015, she asked Dr. Sharma to change her schedule, and although Dr. Sharma also promised to accommodate plaintiff, she did not. Plaintiff claims her colleague Dr. Kalpit Pandya, however, was provided a schedule that accommodated his childcare needs.

Plaintiff also states that one evening in June 2015, when plaintiff asked a white, Jewish orthopedic surgeon to assist with admitting an orthopedic patient because plaintiff herself had seven patients to admit, the surgeon refused. Plaintiff claims Dr. Sharma later called plaintiff and threatened to fire her if such an incident happened again. According to plaintiff, Dr. Sharma said that because plaintiff was black, plaintiff was "not allowed" to ask for help from a Jewish, white doctor. (Am. Compl. at ECF 19).

Plaintiff alleges she then told Dr. Bhatti and Dr. Sharma that additional assistance during the night shift was necessary. According to plaintiff, although both supervisors agreed to obtain additional help for the night shift, they did not. Rather, plaintiff alleges several new and predominantly light-skinned doctors were hired for the day shift.

Plaintiff further alleges that in July 2015, the hospital administration changed certain hospital protocols without informing her, although the predominantly white day-shift doctors were informed of the changes. Plaintiff claims Dr. Sharma called her "at an odd hour" to

"harass" plaintiff because plaintiff had incorrectly followed the old protocol.[3] (Am. Compl. at ECF 19).

Plaintiff claims that around this time, the day-shift doctors "intensified" their "harassment" of her by "dumping their uncompleted work [on her] at night." (Am. Compl. at ECF 19). According to plaintiff, she was the only night-shift doctor who experienced this treatment recurrently, especially from Dr. Pandya, a lighter-skinned doctor. Indeed, plaintiff alleges Dr. Pandya threatened her via text message on August 18, 2015, that he would "torment" her after she told him to complete his own work instead of leaving it for plaintiff to complete. (Am. Compl. at ECF 21). After this text exchange, Dr. Pandya regularly came to work an hour late, requiring plaintiff to stay past the end of her shift. Plaintiff claims she complained to Dr. Sharma and Dr. Bhatti about Dr. Pandya's lateness, but they ignored her complaints. Plaintiff alleges, as a result, she lost over sixty hours in uncompensated time. Plaintiff claims that also in August 2015, Dr. Pandya accused plaintiff of mismanaging a patient's care, but upon investigation, plaintiff was exonerated of any wrongdoing.

Plaintiff alleges that on August 18, 2015, Dr. Sharma called plaintiff in the morning, while plaintiff was sleeping, to "harass[]" her about an issue with a patient's medication. (Am. Compl. at ECF 19). According to plaintiff, Dr. Crystal Kukulka, a white doctor, had a similar issue with the same patient but was not "harassed" about it. (Id. at ECF 21).[4]

---

[3]  According to plaintiff, Dr. Sharma habitually interrupted plaintiff with morning phone calls when plaintiff should have been resting for her night shift.

[4]  Plaintiff alleges a similar incident happened on April 3, 2016, when Dr. Sharma called and woke up plaintiff to accuse plaintiff of wrongdoing respecting a patient's death. Plaintiff claims she was investigated and cautioned for her involvement in the patient's death, but that Dr. Kukulka, who was also involved in the patient's care, was not investigated or cautioned "because of her race." (Am. Compl. at ECF 23).

4

Plaintiff claims she was so overwhelmed at this point by the "unfounded complaints [and] harassments" that she resigned. (Am. Compl. at ECF 21). However, plaintiff alleges she withdrew her resignation on September 1, 2015, because Dr. Sharma told plaintiff that Dr. Sharma would make it impossible for her to get a new job if she resigned.

Plaintiff further alleges that in September 2015, she requested a night-time differential pay but was denied. Plaintiff alleges the night-shift doctor hired after she later resigned in 2016, Dr. Kumar Singh, was paid at least $40,000 more than plaintiff despite providing the same services. In addition, plaintiff alleges two day-shift doctors, Dr. Kukulka and Dr. Pandya, with similar certifications and experience but who were white or lighter-skinned, were paid more than plaintiff.

Plaintiff also claims that in December 2015, Dr. Pandya said to plaintiff, "You black African, nobody wants you here in America so go back to your poor country." (Am. Compl. at ECF 21). Plaintiff does not allege she told her supervisors about this comment.

Plaintiff alleges that in January 2016, Dr. Kukulka regularly stopped admitting patients an hour before Dr. Kukulka's shift ended so that those patients' admission would roll over to plaintiff's shift, even though there were five dayshift doctors on call at one time, as compared to one in the evening. Plaintiff also claims an emergency doctor confirmed Dr. Kukulka instructed other doctors to roll over patients in this manner. According to plaintiff, the day-shift doctors who participated in this patient roll-over practice, including Dr. Bhatti, were either white or light-skinned. According to plaintiff, she raised this to Dr. Bhatti and Dr. Sharma in January of 2016, but neither supervisor took action to address the issue because Dr. Kukulka is white and got "a free pass." (Am. Compl. at ECF 21).

Plaintiff claims that in April 2016, she told Dr. Lance Bruck she was concerned she was being treated differently because of her race and that problems in the hospital were affecting her ability to provide patient care.

Plaintiff also alleges she was the only doctor on call on the evening of April 4, 2016, and was forced to cover both the medical and psychiatric floors, which had some violent patients. Plaintiff says she was not adequately trained or insured to cover the psychiatric floor. Plaintiff alleges the other night physician forced to cover the psychiatric floor without proper training and insurance was another dark-skinned doctor. Plaintiff claims the dayshift doctors, who were mostly white, did not have to attend to psychiatric patients because a psychiatrist was on call during the day.

Plaintiff claims that after she was required to cover the psychiatric floor on April 4, she told Dr. Bhatti and Dr. Sharma she would not return to work until appropriate support was in place. According to plaintiff, both doctors ignored her complaints because she was black.

Plaintiff also alleges she did not receive a $10,000 bonus in either 2015 or 2016. According to plaintiff, the day-shift doctors, who were predominantly white, received bonuses. Plaintiff says she raised this issue with Dr. Sharma, who never responded.

III.     Departure from MidHudson Regional Hospital

According to plaintiff, as a result of the above conduct, she was forced to submit her resignation on April 5, 2016, and that her last day of work was August 5, 2016. Plaintiff claims Dr. Bhatti said he and other doctors in leadership positions would make it impossible for plaintiff to secure a new job at a different location. Plaintiff claims she received several job offers of which Dr. Bhatti was aware, and that those offers were eventually withdrawn.

6

Plaintiff claims that in March 2019, a respiratory therapist who was often on call with her at MidHudson Regional Hospital posted on Facebook that the entire hospital staff had worked hard to get rid of plaintiff.

Plaintiff commenced this action on April 4, 2019.

## DISCUSSION

I. Legal Standard

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by

7

reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

Because plaintiff is proceeding pro se, the Court must construe her submissions liberally and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam). "Even in a pro se case, however . . . threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010). Nor may the Court "invent factual allegations [plaintiff] has not pled." Id.

II. Notice of Claim

Defendants argue plaintiff's NYSHRL claims against MidHudson Regional Hospital, which is owned by Westchester County Health Care Corporation, must be dismissed because plaintiff failed to comply with the state notice of claim requirement before bringing suit.

The Court agrees.

"New York Public Authorities Law § 3316 . . . requires compliance with General Municipal Law § 50-e to maintain an action against a public benefit corporation such as the Westchester County Health Care Corporation. . . . Absent a showing by the plaintiff that a notice of claim has been served, the complaint may be dismissed." Cortlandt v. Westchester County, 2007 WL 3238674, at *7 (S.D.N.Y. Oct. 31, 2007); see also See Harris v. Viau, 2019 WL 1331632, at *6, n.5 (S.D.N.Y. Mar. 25, 2019) (noting notice of claim required before filing suit against Westchester County Health Care Corporation).

Here, plaintiff does not allege, in either her amended complaint or her opposition to the motion to dismiss, that she filed a notice of claim against defendant MidHudson Regional

8

Hospital. Accordingly, the NYSHRL claims against MidHudson Regional Hospital must be dismissed.[5]

III. Federal Claims

Defendants contend the amended complaint alleges race discrimination claims under Section 1981 and the NYSHRL only. Although plaintiff only marked "42 U.S.C. § 1981" and the NYSHRL on the "Employment Discrimination Complaint" form (Am. Compl. at ECF 4), the Court must construe plaintiff's submission liberally and interpret the amended complaint "to raise the strongest arguments that [it] suggests." Triestman v. Fed. Bureau of Prisons, 470 F.3d at 474.

Accordingly, the Court liberally construes plaintiff's amended complaint to allege a claim for race discrimination in violation of Title VII, in addition to Section 1981 and the NYSHRL.[6]

A. Race Discrimination Claims

Defendants argue plaintiff's race discrimination claims must be dismissed because plaintiff did not allege any facts plausibly demonstrating a causal connection between her race and the complained-of conduct.

---

[5] Defendant MidHudson Regional Hospital also argues it is a separate legal entity from plaintiff's employer, Westchester Medical Regional Physician Services, P.C., and that plaintiff does not allege the hospital had any role in the events of which she complains, such that it should be dismissed from the action. Although these arguments may have merit, at this early stage and liberally construing plaintiff's allegations, the Court concludes the amended complaint sufficiently alleges an affiliation between MidHudson Regional Hospital and Westchester Medical Regional Physician Services, P.C., to survive a motion to dismiss on this ground. Of course, if appropriate, defendants may reassert this argument at the summary judgment stage after the completion of discovery.

[6] The Court recognizes that Title VII claims are subject to an exhaustion requirement. See Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) ("[A] claimant may bring suit in federal court only if she has filed a timely complaint with the EEOC and obtained a right-to-sue letter."). To the extent defendants wish to challenge plaintiff's Title VII claim on exhaustion or other grounds, they may do so at the summary judgment stage after the completion of discovery.

The Court disagrees.

1. Applicable Law

Under Title VII, to survive a motion to dismiss, a plaintiff claiming race discrimination "must plausibly allege that (1) the employer took adverse action against him and (2) his race . . . was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015).

A plaintiff satisfies the first prong of a Title VII race discrimination claim by alleging an adverse employment action, which "entails a materially adverse change in the terms and conditions of employment." Quadir v. N.Y.S. Dep't of Labor, 39 F. Supp. 3d 528, 541 (S.D.N.Y. 2014) (quoting Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)).

As to the second prong under Title VII, "at the pleadings stage of an employment discrimination case, a plaintiff has a minimal burden of alleging facts suggesting an inference of discriminatory motivation." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 85. Namely, "a plaintiff must allege that the employer took adverse action against her at least in part for a discriminatory reason, and she may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." Id. at 87.

Under Section 1981, the Supreme Court has recently clarified that in addition to an adverse employment action, a plaintiff must plead that race was a but-for cause of her injury—in other words, the Title VII "motivating factor" causation test does not apply. See Comcast Corp. Nat'l Ass'n of African American-Owned Media, __ S. Ct. __, 2020 WL 1325816, at *7 (S. Ct. Mar. 23, 2020). As with Title VII, under Section 1981, a plaintiff must allege facts from which

10

the Court can infer an intent to discriminate on the basis of race. See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam).

"An inference of discrimination can arise from circumstances including . . . more favorable treatment of employees not in the protected group[,] or the sequence of events leading to the plaintiff's discharge." Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015).

2. Application

Here, plaintiff's allegations satisfy the minimal burden necessary to state a race discrimination claim under both Title VII and Section 1981.

First, at this early stage of the case, plaintiff has sufficiently alleged an adverse employment action because she claims that as a result of the laundry list of discriminatory acts to which she was allegedly subjected over an eleven-month period, she did not receive the same compensation as white or light-skinned colleagues and was "forced . . . to resign" on April 5, 2016. (Am. Compl. at ECF 23).

Second, plaintiff sufficiently alleges both that race was a motivating factor for defendants' actions and was the but-for cause of her injuries; i.e., her lack of equal compensation and her forced resignation. In particular, plaintiff alleges: (i) when she complained about the quality of medical equipment, Dr. Bhatti told plaintiff she "needed to keep a low profile and be less visible and audible because of [her] race and color," and that she was "going to be set up for unrelenting [sic] attacks"; (ii) Dr. Sharma told plaintiff that because she was black, she could not ask a white, Jewish doctor for assistance; (iii) a colleague said to her, "You black African, nobody wants you here in America so go back to your poor country"; (iv) the only doctors who were forced to cover the psychiatry floor at night, without proper training and insurance, were plaintiff and another dark-skinned doctor; and (v) she did not get a $10,000 bonus, but other doctors, who were predominantly white, did. These allegations, taken as true, are sufficient to

11

"give plausible support to a minimal inference of discriminatory motivation" for plaintiff's Title VII and Section 1981 race discrimination claims. Littlejohn v. City of New York, 795 F.3d at 311.

Moreover, plaintiff alleges other "facts that indirectly show discrimination [that] giv[e] rise to a plausible inference of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 87 (emphasis added). For example, plaintiff alleges Dr. Sharma called her on two occasions, when Dr. Sharma knew she would be sleeping, to complain about plaintiff's treatment of certain patients. However, according to plaintiff, Dr. Kukulka, a white doctor, also had issues with these same patients, but was not investigated or reprimanded. Moreover, plaintiff alleges Dr. Kukulka directed day-shift doctors, many of whom were white or light-skinned including plaintiff's supervisor, Dr. Bhatti, not to admit patients during their shifts, but rather roll their admissions onto plaintiff's night shift. Finally, plaintiff alleges she was not provided a different work schedule to accommodate her childcare needs, but that Dr. Pandya, a light-skinned colleague, received such accommodation.

Accordingly, plaintiff's race discrimination claims under Title VII and Section 1981 shall proceed.

B. Hostile Work Environment Claim

Defendants argue plaintiff's hostile work environment claim must be dismissed because plaintiff does not point to conduct that is sufficiently severe or pervasive to support such a claim.

The Court agrees.

1. Applicable Law

To establish a hostile work environment claim under Title VII or Section 1981, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998). To survive a motion to dismiss, "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (quoting Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)).

To state a claim for a hostile work environment, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]." Patane v. Clark, 508 F.3d at 113. "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014). To determine whether a plaintiff has suffered from a hostile work environment, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 23.

2. Application

Here, while plaintiff does allege several concerning incidents, plaintiff's allegations, viewed as a whole, cannot be characterized as objectively "severe" or "pervasive" enough to state a hostile work environment claim.

The allegations underlying plaintiff's hostile work environment claim can be summarized as follows: (i) plaintiff was criticized for the quality of care she provided some patients; (ii)

13

when plaintiff raised concerns about the quality of medical equipment at MidHudson Regional Hospital, she was told to "keep a low profile and be less visible and audible because of [her] race and color" and that she was going "to be set up for unrelentless [sic] attacks"; (iii) when plaintiff asked an orthopedic surgeon to assist her by admitting a patient, she was reprimanded and told she was "not allowed" to request assistance from a white, Jewish doctor; (iv) plaintiff was "dumped on" because other doctors left patients to be admitted during her shift, an issue her supervisors agreed to correct, but did not; (v) MidHudson Hospital did not inform her of changed protocols; (vi) Dr. Pandya threatened to "torment" her, would arrive late to relieve her of her shift, and said to her, "You black African, nobody wants you here in America so go back to your poor country"; (vii) plaintiff was forced to cover psychiatric floors even though she was not trained or insured to do so; (viii) supervisors told plaintiff she would not be able to find a new job if she resigned; and (ix) after plaintiff resigned, a former colleague posted on Facebook that the hospital staff worked to get rid of plaintiff.

Most of these claims do not "rise objectively to the level of racial hostility." Murray-Dahnir v. Loews Corp., 1999 WL 639699, at *4 (S.D.N.Y. Aug 23, 1999) (no hostile work environment claim where the plaintiff alleged he was required to "work extraordinary hours without proper staffing and support" and was unfairly criticized).

Three comments allegedly made to plaintiff—that she should keep quiet because of her race; that she could not ask a white, Jewish doctor for assistance; and that as a "black African," she should go back to her "poor country"—objectively rise to the level of racial hostility, but are not severe or pervasive enough to sustain a hostile work environment claim. If true, such remarks, even on a single occasion, are appalling. But for purposes of evaluating a hostile work environment claim under Title VII and Section 1981, the infrequent and sporadic nature of the remarks at issue, over the course of almost two years, are episodic and not "sufficiently

continuous and concerted in order to be deemed pervasive" to sustain a hostile work environment claim. See Raspardo v. Carlone, 770 F.3d at 114.

Essentially, plaintiff complains of a workplace that does not meet her standards for civility. But Title VII "does not set forth a general civility code for the American workplace." Redd v. N.Y. Div. of Parole, 678 F.3d 166, 176 (2d Cir. 2012) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). Simply put, plaintiff's allegations, taken as true, do not illustrate objectively severe and pervasive conduct sufficient to give rise to an actionable hostile work environment claim.

Accordingly, plaintiff's hostile work environment claim must be dismissed.

C. Retaliation Claim

Defendants argue plaintiff's retaliation claim must be dismissed because plaintiff fails plausibly to allege the conduct to which she was subjected was due to retaliatory animus.

The Court disagrees.

1. Applicable Law

Retaliation claims under Title VII and Section 1981 are both analyzed pursuant to Title VII principles and the familiar McDonnell Douglas burden-shifting evidentiary framework. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). To establish a presumption of retaliation at the initial stage of a race discrimination case, a plaintiff plausibly must plead that "(1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." Patane v. Clark, 508 F.3d at 115.

Regarding the first element, an activity is considered protected under one of two clauses: (i) the opposition clause, which proscribes an employer from retaliating against an employee "because she 'opposed any practice' made unlawful by Title VII"; and (ii) the participation

clause, which makes it unlawful to retaliate against an individual because she "made a charge, testified, assisted, or participated in Title VII investigation or proceeding." Littlejohn v. City of New York, 795 F.3d at 316.

"When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Littlejohn v. City of New York, 795 F.3d 297 at 317 (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cty., 555 U.S. 271, 276 (2009)).

As for the second element, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 90 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive [discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 60). "Context matters. . . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. at 69.

Regarding the third element, causation can be shown either (i) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or (ii) "indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

16

The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001). However, "the temporal proximity must be 'very close.'" Riddle v. Citigroup, 640 F. App'x 77, 79 (2d Cir. 2016) (summary order) (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)).

2. Application

Here, drawing all reasonable inferences in plaintiff's favor, as the Court must at this early stage of the case, the Court concludes plaintiff plausibly alleges a retaliation claim.

First, plaintiff plausibly alleges she engaged in protected activity when: (i) on May 6, 2015, in response to Dr. Bhatti's comment to "keep a low profile" because of her "race and color," plaintiff asked Dr. Bhatti if she should not express herself due to her race; (ii) in May 2015, plaintiff told Dr. Sharma about Dr. Bhatti's comment that plaintiff needed to "keep a low profile" due to plaintiff's "race and color"; and (iii) in April 2016, plaintiff informed her supervisor, Dr. Bruck, that plaintiff was concerned she was being treated differently due to her race. Plaintiff also makes several references throughout her amended complaint that Dr. Bhatti and Dr. Sharma knew about her discrimination claims. Although plaintiff does not provide specific dates on which they became aware of the discrimination—or of what discrimination—at this stage in the litigation, this allegation too is sufficient to show that plaintiff engaged in protected activity.

As to the next two prongs of the analysis, plaintiff has alleged several incidents that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," Vega v. Hempstead Union Free Sch. Dist., 801 F.3d at 90, and that were temporally close to the plaintiff's protected activity to plausibly allege a causal connection.

17

After the alleged May 2015 incident with Dr. Bhatti, which she soon reported to Dr. Sharma, plaintiff alleges that: (i) after June 2015, additional doctors were hired for the dayshift, but not the night shift; (ii) in June 2015, Dr. Bhatti declined to change her schedule to accommodate her childcare; (iii) after July 2015, the day-shift doctors, and especially Dr. Pandya, "dumped" their work on plaintiff, and when plaintiff complained about Dr. Pandya's constant lateness, Dr. Bhatti and Dr. Sharma took no action; (iv) in August 2015, Dr. Sharma declined to change her schedule to accommodate her childcare needs, though at some point, Dr. Pandya's schedule was adjusted to accommodate his childcare needs; (v) Dr. Kukulka was not investigated and reprimanded about an incident concerning a patient on August 18, 2015, even though plaintiff was; (vi) in August 2015, after plaintiff resigned for the first time, Dr. Sharma threatened that she would keep plaintiff from getting a new job; (vii) in September 2015, plaintiff requested, and was denied, a night-time pay differential; (viii) in January 2016, day-shift doctors, including Dr. Bhatti "dumped" work on plaintiff, purportedly at the direction of Dr. Kukulka; and (ix) plaintiff did not get a $10,000 bonus for 2015, even though other doctors received such a bonus.

Similarly, after plaintiff allegedly told Dr. Bruck in April 2016 she was concerned she was being treated differently due to her race, plaintiff alleges: (i) in April 2016, she was forced to attend to patients in the psychiatric ward, without proper training or insurance; (ii) on April 3, 2016, she was again investigated and reprimanded about a patient while Dr. Kukulka, who was also involved in an issue with the same patient, was not; (iii) after she resigned in April 2016, she lost new job opportunities, several of which Dr. Bhatti knew she was being considered for; and (iv) she did not get a $10,000 bonus for 2016, even though other doctors received such a bonus.

For the above reasons, plaintiff has plausibly stated a retaliation claim.

IV.　New York State Human Rights Law Claim

Defendants argue the three-year statute of limitations for claims under the NYSHRL requires dismissal of plaintiff's claims insofar as they concern conduct outside the limitations period.[7]

The Court agrees.

The limitations period for filing a NYSHRL claim is three years. Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012). Here, plaintiff first explicitly asserted a NYSHRL claim on June 21, 2019, when she filed the amended complaint and checked the NYSHRL box on her "Employment Discrimination Complaint" form. (Am. Compl. at ECF 7). However, given that plaintiff is proceeding pro se, the Court will liberally construe plaintiff's original complaint, filed on April 4, 2019, as having raised a NYSHRL claim. In the original complaint, plaintiff did not check the NYSHRL box on the "Employment Discrimination Complaint" form, but raised the same claims based on basically the same allegations as in the amended complaint. (Doc. #1 at ECF 4).

Nevertheless, because a three-year statute of limitations applies to NYSHRL claims, the court dismisses plaintiff's race discrimination claim brought under the NYSHRL insofar as it relies on any conduct alleged to have occurred prior to April 4, 2016.

Because, however, discrimination and retaliation claims under the NYSHRL are evaluated under the same standards applicable to claims brought under Section 1981 and Title VII, see Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010), plaintiff plausibly alleges such claims under the NYSHRL as to conduct alleged to have occurred on or after April 4, 2016.

---

[7]　As noted above, any NYSHRL claims against MidHudson Regional Hospital are dismissed because plaintiff failed to comply with the state notice of claim requirement.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.

Plaintiff's hostile work environment claim pursuant to Title VII, Section 1981, and the NYSHRL is dismissed.

Plaintiff's race discrimination and retaliation claims pursuant to Title VII, Section 1981, and NYSHRL—to the extent the NYSHRL claim is based on conduct on or after April 4, 2016—shall proceed, except that the NYSHRL claim asserted against MidHudson Regional Hospital is dismissed.

By April 6, 2020, defendants shall file an answer to the amended complaint.

The Clerk is instructed to terminate the motion. (Doc. #18).

Dated: March 23, 2020            SO ORDERED:
       White Plains, NY

_____
Vincent L. Briccetti
United States District Judge